# IN THE SUPREME COURT OF CALIFORNIA

GOLDEN STATE WATER COMPANY,
Petitioner,

v.

PUBLIC UTILITIES COMMISSION,
Respondent.

S269099

Cal.P.U.C. Decision No. 20-08-047

_____

CALIFORNIA-AMERICAN WATER COMPANY et al.,
Petitioners,

v.

PUBLIC UTILITIES COMMISSION,
Respondent.

S271493

Cal.P.U.C. Decision Nos. 20-08-047 and 21-09-047

July 8, 2024

Justice Kruger authored the opinion of the Court, in which Chief Justice Guerrero and Justices Corrigan, Liu, Groban, Jenkins, and Evans concurred.

GOLDEN STATE WATER COMPANY v. PUBLIC
UTILITIES COMMISSION[*]

S269099

Opinion of the Court by Kruger, J.

In recent decades, California has experienced severe and recurring drought conditions that have heightened concerns about how water is sold. Like any other service provider, water companies typically have a financial incentive to sell more of their service. To reduce that financial incentive to sell more water to more consumers, and thus to encourage water conservation, the Public Utilities Commission in 2008 allowed certain water companies to structure their rates in a way that "decouples" revenue from the amount of water sold. More than a decade later, in a proceeding ostensibly focused on improving the accuracy of water sales forecasts necessary for use of this decoupling mechanism, the Commission ordered that the mechanism be eliminated altogether.

The issue before us does not concern the merits of this decision, but the process that led up to it. The question is whether the Commission gave adequate notice that the elimination of the decoupling mechanism was one of the issues to be considered in the proceeding. We conclude that the answer is no. We further conclude that the Commission's failure to give adequate notice requires us to set the order aside.

---

[*] Consolidated with *California-American Water Company et al. v. Public Utilities Commission* (S271493).

1

# I.

Petitioners are five large water utilities and an association that represents investor-owned water utilities' interests; for simplicity's sake, we refer to the utilities collectively as the Water Companies. They seek to set aside an order of the Public Utilities Commission eliminating a type of conservation-focused ratesetting mechanism known as the Water Revenue Adjustment Mechanism, based on defects in the proceedings that led to the issuance of the order. This case does not concern the substance of the Commission's decision, but some understanding of the substance helps to explain the nature of the procedural dispute now before us. We therefore begin by offering a brief overview of the mechanisms at issue in the challenged order before turning to the history of how that order came to be.

## A. Water Revenue Adjustment Mechanism and Modified Cost Balancing Account

The Water Companies are what is known as Class A water utilities, a term the Commission uses to refer to water utilities with more than 10,000 service connections. Under the Public Utilities Code, these large water utilities must periodically seek the Commission's approval of future rates through a formal "general rate case" (often abbreviated as "GRC") application process. (See Pub. Util. Code, § 455.2, subd. (c).)[1]

One issue relevant to the amount and structure of rates is California's interest in water conservation. Because water

---

[1] Other, smaller utilities must also seek the Commission's approval to change the rates they charge customers. (See, e.g., Pub. Util. Code, § 454, subd. (b).)

utilities' revenue comes in part from quantity charges — that is, charges based on the amount of water sold to customers — companies in the business of selling water generally have a financial incentive to sell more water. That incentive is in tension with California's interest in reducing water consumption — an interest that is particularly acute in an era marked by frequent and sustained periods of drought.

Seeking to alleviate that tension, the Commission in 2008 authorized certain utilities to implement concepts known as the Water Revenue Adjustment Mechanism and the Modified Cost Balancing Account. A Water Revenue Adjustment Mechanism (WRAM) works by tracking the difference between quantity-rate revenues authorized by the Commission and quantity-rate revenues billed by a utility. If the Commission authorizes more quantity-rate revenue than the utility bills, the utility may be able to surcharge customers. If the Commission authorizes less quantity-rate revenue than the utility bills, a credit to customers might instead be appropriate. To determine whether a surcharge or credit is warranted, and in what amount, the difference between authorized and actual quantity-rate revenue is netted against a Modified Cost Balancing Account (MCBA), which tracks the difference between certain authorized and actual water provision costs.

As the Commission has explained, "[t]he major purpose" of adopting this approach "was to decouple sales from revenues and thus promote conservation." The incentive to sell more water is reduced if revenues above those authorized must be returned to customers and revenues below those authorized can be surcharged. Because the WRAM approach depends on tracking the difference between actual quantity-rate revenues

and revenues approved by the Commission, the mechanism depends on forecasting water sales. Forecasts affect the quantity revenue rates approved by the Commission and thus whether customers will have to pay WRAM surcharges on their water bills.

In the 2020 order challenged here, the Commission prohibited the water companies from proposing the WRAM/MCBA approach but allowed water companies to instead propose using something known as a Monterey-style WRAM (M-WRAM) with an Incremental Cost Balancing Account (ICBA). Although the names are similar, the mechanisms are meaningfully different. The Monterey-style WRAM with ICBA is also a revenue adjustment mechanism, but in contrast to a WRAM, it is not a full decoupling mechanism; the M-WRAM instead adjusts for the difference between revenue collected under a tiered "conservation" rate structure, designed to impose increased costs for use of water exceeding certain thresholds, and the revenue that would have been collected, at actual sales levels, with a uniform rather than tiered structure in place.

## B. Prior Commission Proceedings Addressing Water Revenue Adjustment Mechanisms and Modified Cost Balancing Accounts

After approving the Water Revenue Adjustment Mechanism/Modified Cost Balancing Account approach in 2008, the Commission conducted various proceedings addressing the efficacy and advisability of maintaining that approach.

In 2012, the Commission concluded that it "require[d] a more vigorous review of the Water Revenue Adjustment Mechanism/Modified Cost Balancing Account (WRAM/MCBA)

4

mechanisms and options to the mechanisms, as well as sales forecasting," to be conducted in pending and future general rate case proceedings. (*Decision Addressing Amortization of Water Revenue Adjustment Mechanism Related Accounts and Granting in Part Modification to Decision* (Apr. 19, 2012) Cal.P.U.C. Dec. No. 12-04-048 [2012 Cal.P.U.C. Lexis 191, *60–*61] (*Decision 12-04-048*).) The Commission ordered that in these upcoming general rate case proceedings, applicants should provide testimony addressing various alternatives, including "eliminat[ing] the WRAM mechanism" and "adopt[ing] a Monterey-style WRAM rather than the existing full WRAM." (*Id.*, at pp. *62, *61.)

In 2013, in connection with Golden State Water Company's general rate case, the Commission issued a decision addressing "the first review of Golden State's conservation rate pilot programs . . . , including a review of the Water Revenue Adjustment Mechanism (WRAM) and Modified Cost Balancing Account (MCBA)." (*Decision on the 2011 General Rate Case for Golden State Water Company* (May 9, 2013) Cal.P.U.C. Dec. No. 13-05-011 [2013 Cal.P.U.C. Lexis 221, *2].) The decision found "that the WRAMs/MCBAs are achieving their stated purpose by severing the relationship between sales and revenue and removing most disincentives for Golden State to implement conservation rates and conservation programs." (*Id.*, at pp. *2–*3.) The decision acknowledged difficulties with implementation: "Because Golden State is authorized to collect via the WRAM the difference between its authorized and actual revenues, the over-estimate of forecasted water consumption has resulted in substantial under-collection of authorized revenues. Parties identify the sales forecasting methodology as

a factor leading to large WRAM balances but state that other factors such as weather, the economy, drought declarations, or community involvement in conservation programs also reduce consumption and thereby affect WRAM balances. Whatever the cause, the large revenue under-collections result in large WRAM surcharges that customers perceive as punishment for conserving water." (*Id.*, at p. *102, fn. omitted.) Nevertheless, "[b]ecause the WRAMs/MCBAs established for Golden State are functioning as intended," the Commission determined that none of the alternatives described in the 2012 order "should be adopted at this time." (*Id.*, at p. *110.) The Commission thus declined to either eliminate the WRAM or switch to a Monterey-style WRAM. The latter option, the Commission concluded, "should not be adopted because [it] would tie sales to revenues, and, as a result, could discourage Golden State from offering conservation rates and conservation programs, and undermine efforts to reduce water consumption." (*Id.*, at p. *113.)

In 2015, the Commission issued a scoping memo in connection with a rulemaking proceeding. By statute, a scoping memo issues after the start of a proceeding and, among other things, "describes the issues to be considered" in that proceeding. (Pub. Util. Code, § 1701.1, subds. (b)(1), (c).) The 2015 scoping memo solicited feedback on 16 topics, several of which centered on Water Revenue Adjustment Mechanisms and Modified Cost Balancing Accounts. Among other things, the scoping memo asked whether these mechanisms encourage conservation and how they might be refined.

In December 2016, the Commission considered evidence collected in response to that scoping memo and a related workshop. (See *Decision Providing Guidance on Water Rate*

*Structure and Tiered Rates* (Dec. 1, 2016) Cal.P.U.C. Dec.
No. 16-12-026 [2016 Cal.P.U.C. Lexis 682, *1, *17–*24, *128]
(*Decision 16-12-026*).) The Commission "conclude[d] that, at
this time, the WRAM mechanism should be maintained." (*Id.*,
at p. *63.) But "to lessen resort to and impact of WRAMs" (*ibid.*),
the Commission ordered investor-owned Class A water utilities
to "propose improved forecast methodologies in their General
Rate Case application, or in standalone, separate applications"
(*id.*, at p. *130). That decision (D.16-12-026) and the
rulemaking in connection with which it was issued (R.11-11-
008) are cited in the initial scoping memo for the proceeding at
issue here, which began about seven months later.

## C. Proceedings in This Rulemaking Before Issuance of the Proposed Decision

In July 2017, the Commission commenced the rulemaking
that culminated in the order challenged here. Among other
things, that order requires the discontinuation of
WRAMs/MCBAs.

The central question now before us is whether the
Commission gave adequate notice that eliminating the
WRAMs/MCBAs was on the table, so our recitation of the
relevant background focuses on the notice the parties received
with respect to that issue. We focus in particular on four memos
or rulings of note: (1) the initial scoping memo; (2) an amended
scoping memo; (3) a June 2019 Administrative Law Judge (ALJ)
ruling; and (4) a September 2019 ALJ ruling.

### 1. Initial Scoping Memo

The Commission entered an order instituting rulemaking
on July 10, 2017. After a prehearing conference and two
workshops, the assigned commissioner issued a scoping memo

stating that "[t]he issues to be addressed in this proceeding relate to a review of low-income rate assistance programs for water utilities."

The proceeding was to be divided into two phases. The first phase was to address the following issues:

"1. Consolidation of at risk water systems by regulated water utilities. [¶] a. How could the Commission work with the [State Water Resources Control Board] and Class A and B water utilities to identify opportunities for consolidating small non-regulated systems within or adjacent to their service territories that are not able to provide safe, reliable and affordable drinking water? Should the Commission address consolidation outside of each utility's general rate case (GRC)? [¶] b. In what ways can the Commission assist Class A and B utilities that provide unregulated affiliate and franchise services to serve as administrators for small water systems that need operations & maintenance support as proscribed [*sic*] by Senate Bill (SB) 552 (2016)?

"2. Forecasting Water Sales [¶] a. How should the Commission address forecasts of sales in a manner that avoids regressive rates that adversely impact particularly low-income or moderate income [*sic*] customers? [¶] b. In Decision (D.)16-12-026, adopted in Rulemaking 11-11-008, the Commission addressed the importance of forecasting sales and therefore revenues. The Commission, in D.16-12-026, directed Class A and B water utilities to propose improved forecast methodologies in their GRC application. However, given the significant length of time between Class A water utility GRC filings, and the potential for different forecasting methodologies proposals in individual GRCs, the Commission will examine

how to improve water sales forecasting as part of this phase of the proceeding. What guidelines or mechanisms can the Commission put in place to improve or standardize water sales forecasting for Class A water utilities?

"3. What regulatory changes should the Commission consider to lower rates and improve access to safe quality drinking water for disadvantaged communities?

"4. What if any regulatory changes should the Commission consider that would ensure and/or improve the health and safety of regulated water systems?"

The scoping memo further specified that the issues to be addressed "in Phase II or if necessary a Phase III" were as follows: "5. Program Name; [¶] 6. Effectiveness of [Low Income Rate Assistance (LIRA)] Programs; [¶] 7. Monthly Discounts; [¶] 8. Program Cost Recovery; [¶] 9. Commission Jurisdiction Over Other Water Companies; and [¶] 10. Implementation of Any Changes to Existing LIRA Programs."

The California Water Association, among others, filed comments addressing these issues. In response to the sales forecasting question, the Association argued that "the Commission should also consider folding the Water Revenue Adjustment Mechanism/Modified Cost Balancing Account . . . recovery into base rates instead of surcharges." "Approving mechanisms to update forecasts between general rate cases," it added, "is the best way to minimize the need for surcharges that alienate all customers, including low-income or moderate-income customers."

### 2. *Amended Scoping Memo*

Several months later, in July 2018, the assigned commissioner issued an amended scoping memo. Citing developments since the issuance of the first scoping memo in January 2018, the amended scoping memo added two issues to the proceeding: "1. How best to consider potential changes in rate design such that there is a basic amount of water that customers receive at a low quantity rate; and [¶] 2. Whether the [Commission] should adopt criteria to allow for sharing of low-income customer data by regulated investor-owned energy utilities with municipal water utilities."

### 3. *June 2019 ALJ Ruling*

A workshop about rate design followed nearly a year later. In June 2019, after Commission staff prepared a report summarizing the workshop, an ALJ issued a ruling that called for comments on the report and that scheduled an August 2019 workshop "to discuss potential changes to enhance water affordability, including the existing low-income programs." The June 2019 ruling also posed several questions to be discussed at that future workshop. None of the 11 enumerated questions (nor any of their subquestions) mentioned the WRAM/MCBA. The questions included: "What if any changes should the Commission consider as to its water forecasting? How do we include the potential for drought in forecasting future sales, or what other mechanism can be implemented to ensure a more accurate forecast? [¶] . . . Should there be a mechanism to adjust rates mid-year or end of year as the shortfalls occur, especially during drought years?"

The issue of eliminating the WRAM/MCBA was raised in comments submitted in response to the ALJ's ruling.

Specifically, in response to the question whether there should be a mechanism to adjust rates in the middle or at the end of the year as water shortfalls occur, the Public Advocates Office at the Commission took the view that it would be better to adopt a different approach to water revenue adjustment altogether. The Office explained: "The Commission should . . . order conversion of full Water Revenue Adjustment Mechanisms (WRAMs) to Monterey-style WRAMS, which are directly tied to the impact of conservation efforts on water consumption. The Commission should then explore eliminating any and all decoupling mechanisms because compliance to conservation mandates is now required by law, addressing any disincentives utilities might have to achieve conservation outcomes."

The California Water Association filed a reply. The Association objected that the Public Advocates Office's suggestion to abandon decoupling mechanisms went "well beyond the appropriate scope of the questions presented" and "falls well outside the scope of this proceeding." The Association also disagreed with the Office's proposal on the merits.

### 4. September 2019 ALJ Ruling

The Commission held the August workshop "to address outstanding issues and party comments received on the following topics: 1) consolidation of at-risk systems; 2) forecasting/drought; and 3) rate design." Commission staff prepared a report about that workshop as well. An ALJ ruling followed in September 2019, noting that "the proposed decision in this proceeding may include amendments to the Commission's program rules in the areas of consolidation, forecasting, rate design, and other implementation measures to enhance water affordability, including low-income programs."

"In order to ensure a complete record for consideration in this proceeding the parties, in addition to commenting on the . . . Staff Report, are to respond to the questions set out below." The ruling then enumerated 18 sets of questions, most notably: "6. For utilities with a full Water Revenue Adjustment Mechanism (WRAM)/Modified Cost Balancing Account (MCBA), should the Commission consider converting to Monterey-style WRAM with an incremental cost balancing account? Should this consideration occur in the context of each utility's GRC? [¶] 7. Should any amortizations required of the Monterey-style WRAM and incremental cost balancing accounts be done in the context of the GRC and attrition filings?"

The record prepared by the parties in this case includes excerpts or complete copies of comments and reply comments filed by the California Water Association and the Public Advocates Office. The most notable of those comments addressed question six, regarding whether the Commission should "consider converting to Monterey-style WRAM."

The Public Advocates Office answered "Yes." It elaborated: "[T]he Commission should provide the clear and unambiguous policy direction in this Rulemaking that utilities should convert full WRAMs to Monterey-style WRAMs. Implementation of this policy can then proceed efficiently in pending and future GRCs of all Class A water utilities."

The California Water Association's reply expressed "vehement[]" disagreement with the proposal to convert to M-WRAMs. In its initial comments, the Association argued that converting "to Monterey-style WRAMs in this rulemaking proceeding is a procedurally improper method for seeking to modify several final Commission Decisions and falls well outside

the scope of this proceeding. These mechanisms do not have anything to do with providing assistance to low-income customers." On the merits, the Association also argued, among other things, that "the Monterey-style WRAM does not decouple sales from revenues and therefore fails to address the perverse incentive for water utilities to increase water sales and discount conservation efforts."

Responding to this latter claim, the Public Advocates Office contended that the "statement is not supported by actual data." The Office included a graph that it described as showing that "water utilities with and without full decoupling WRAM have shown almost identical trends in annual sales fluctuations."[2]

## D. Proposed Decision

The assigned commissioner issued a proposed decision in July 2020. The decision proposed to order, among other things, that several water companies, "in their next general rate case applications, shall transition existing Water Revenue Adjustment Mechanisms to Monterey-Style Water Revenue Adjustment Mechanisms."

Several water companies objected to the proposed decision. In addition to concerns about the merits of requiring

---

[2] Several months later, the assigned commissioner issued a second amended scoping memo "to request comments to consider potential Commission response to the COVID-19 pandemic and initiate[] Phase II" of the rulemaking. The additional questions set out in the ruling concern Phase II of the rulemaking and are not at issue here.

such a transition, the companies expressed concerns about the procedures leading up to the proposed decision.

The California-American Water Company, for example, argued that "[t]he issue of elimination of the WRAM/MCBA is outside the scope of the proceeding and was never explicitly identified in the scoping memos. If the [Commission] intends to address this issue, it should do so in a separate proceeding that would provide parties, particularly those interested in conservation issues, a fair and full opportunity to participate." The Company further argued that "[t]he record in this proceeding on the conservation impact of the decoupling WRAM/MCBA is incomplete and ignores the significant conservation achievements of the utilities with WRAM/MCBAs." Others similarly contended that the proposed decision contained factual errors related to the limited procedures leading up to the decision.

A former commissioner submitted a letter in her personal capacity. She wrote, among other things, that the proposal to order utilities to abandon Water Revenue Adjustment Mechanisms was "not within this proceeding's scope and thus not fully litigated in this proceeding." She explained that the proposed decision "fail[ed] to recognize the functional difference between forecasting (a set of tools used to project water consumption and assist in rate-setting) [and] the WRAM and MCBA (mechanisms to collect rates and track the difference between authorized rates and revenues)."

## E. Decision and Order

A few weeks after receiving comments on the proposed decision, the Commission entered its Decision No. 20-08-047

and accompanying order.  Among other things, the decision and order mandated a shift away from use of WRAMs.

The Commission explained that its "decision evaluates the sales forecasting processes used by water utilities and concludes that, after years as a pilot program, the Water Revenue Adjustment Mechanisms have proven to be ineffective in achieving its [*sic*] primary goal of conservation.  This decision therefore identifies other benefits the Water Revenue Adjustment Mechanisms provide that are better achieved through the Monterey-Style Water Revenue Adjustment Mechanisms and requires water utilities to propose Monterey-Style Water Revenue Adjustment Mechanisms in future general rate cases."  The Commission ordered that the Water Companies "shall not propose continuing existing Water Revenue Adjustment Mechanisms/Modified Cost Balancing Accounts but may propose to use Monterey-Style Water Revenue Adjustment Mechanisms and Incremental Cost Balancing Accounts."

Responding to the objection that terminating WRAMs was outside the scope of the proceeding, the Commission stated: "Consideration of changes to the WRAM/MCBA is and has always been within the scope of this proceeding as part of our review of how to improve water sales forecasting."  The Commission noted that its decision was supported by evidence presented by the Public Advocates Office reply comments to the September 2019 ALJ ruling (comments which included the aforementioned graph) and emphasized "the fundamental point that no party has presented evidence or arguments that persuade us that the pilot WRAM/MCBA mechanism provides discernable benefits that merit its continuation."  Further, the Commission stated, "no water company or any other party

offered any alternative to the WRAM/MCBA process other than allowing companies to use a Monterey-Style WRAM in future GRCs." The decision and order does not explicitly respond to objections that the record was insufficient to decide whether to prohibit future use of WRAMs, nor does the decision and order explicitly respond to some of the examples offered by the California Water Service Company, in response to the proposed decision, as alternative ways to "minimize WRAM balances and/or recover under-collected revenues relating to decoupling." (Fn. omitted.)

Commissioner Randolph dissented, faulting the majority for eliminating the Water Revenue Adjustment Mechanism "instead of focusing on improving sales forecasts" to decrease WRAM balances.

## F. Rehearing

Several water companies sought rehearing, raising a litany of procedural and substantive concerns. The Commission denied rehearing. As in the original decision, the Commission rejected the idea that parties lacked notice that the Commission was considering eliminating the WRAM/MCBA approach in this proceeding. The Commission reasoned that "[t]he issue of the decoupling WRAM was included in the original Scoping Memo as part of the water sales forecasting issue." It elaborated: "One of the main reasons that water sales forecasting is important to the Commission is that when forecast sales are higher than actual sales, the WRAM utilities recover that difference in revenue through surcharges on customer's bills. Therefore, the risk of inaccurate forecasting is borne by the ratepayers. For non-WRAM utilities, if the water sales forecast is higher than actual sales, there is no mechanism to true-up the difference,

16

therefore the risk is borne by the utility. Our concern about water sales forecasting and its effect on rates is, therefore, heightened because of the WRAM."

The Commission further addressed objections concerning the evidence supporting its decision. It acknowledged that "Golden State argues that Finding of Fact #11, which states that the WRAM/MCBA has led to substantial under-collections and subsequent increases in quantity rates, is unsupported by current data," and that Golden State "alleges that its comments on the [proposed decision] provided more current data reflecting it had over-collections in two of its service areas in recent years." The Commission rejected this argument because "comments on the [proposed decision] are not included in the evidentiary record." The Commission also concluded that the decision to eliminate the WRAM was supported by record evidence, relying again in part on the graph the Public Advocates Office submitted in reply comments, and faulting the parties for not seeking "permission to respond to the graph they now dispute or to have the graph stricken from the record." The Commission further argued that the problems certain utilities identified with the graph "related to the measurement or interpretation of the data provided in" the graph, rather than contending "that the data are inaccurate."

## II.

We issued writs of review in May 2022 and consolidated these cases soon after. (See Pub. Util. Code, § 1756, subd. (f).) That September, the Governor signed Senate Bill No. 1469 (2021–2022 Reg. Sess.) (Senate Bill No. 1469), concerning conservation-related decoupling mechanisms. The Commission has asked us to dismiss review on grounds that the new

legislation renders the case moot. We will begin with that threshold issue.

In enacting Senate Bill No. 1469, the Legislature found that "[b]ecause water suppliers have very significant fixed costs that do not fluctuate with changes in consumption patterns, they have a financial disincentive to encourage water conservation as reductions in water consumption directly translate into cost recovery challenges." (Sen. Bill No. 1469 (2021–2022 Reg. Sess.) § 1, subd. (a)(5).) To address this concern, the Legislature announced its intention "to ensure that water corporations are authorized to establish revenue adjustment mechanisms that provide for a full decoupling of sales and revenue in order to further incentivize water conservation efforts." (*Id.*, § 1, subd. (b).) As amended, the Public Utilities Code now instructs that "[u]pon application by a water corporation with more than 10,000 service connections, the commission shall consider, and may authorize, the implementation of a mechanism that separates the water corporation's revenues and its water sales, commonly referred to as a 'decoupling mechanism.' " (Pub. Util. Code, § 727.5, subd. (d)(2)(A).)

Shortly after Senate Bill No. 1469 was enacted, the Commission moved for dismissal on grounds of mootness or else reconsideration of our initial issuance of the writs of review. We denied the motion without prejudice to the Commission "raising arguments concerning mootness in its answer brief" in this court. In its answer brief, the Commission renewed those arguments.

A case becomes moot when events " 'render[] it impossible for [a] court, if it should decide the case in favor of plaintiff, to

grant him any effect[ive] relief whatever.' " (*Paul v. Milk Depots, Inc.* (1964) 62 Cal.2d 129, 132; accord, *In re D.P.* (2023) 14 Cal.5th 266, 276.) A case is not moot if the parties retain a concrete interest in the outcome. (*Ellis v. Railway Clerks* (1984) 466 U.S. 435, 442; accord, *Chafin v. Chafin* (2013) 568 U.S. 165, 172 (*Chafin*).)

Here, the Commission argues that Senate Bill No. 1469 gives the Water Companies everything they seek in this action — namely, a full opportunity to address the merits of WRAMs and MCBAs. But the statute refers only to consideration of a mechanism for decoupling revenue from sales — that is, a WRAM. It does not, at least in terms, address the MCBA, which concerns costs rather than revenues.[3] Nor is the statute's requirement to "consider" authorizing "a mechanism" to decouple sales from revenues (Pub. Util. Code, § 727.5, subd. (d)(2)(A)) necessarily equivalent to what the Water Companies are asking for here, which is to vacate the Commission's past decision forbidding them from proposing continuation of their "existing Water Revenue Adjustment Mechanisms/Modified Cost Balancing Accounts." The practical difference between these remedies may well be limited, but we consider it "enough to save this case from mootness." (*Chafin, supra,* 568 U.S. at p. 176.) And even if the case were technically

---

[3] Indeed, even the Commission's position on what the legislation requires appears to have evolved. In its motion to dismiss, the Commission argued that "[a]s a result of SB 1469, the water companies are now authorized to file for *WRAM/MCBA* protection in their future general rate case applications." (Italics added.) By contrast, in its merits brief, the Commission described the companies as "now authorized to file for *WRAM* protection." (Italics added.)

moot, we may decide a case on the merits when, as here, the public interest favors resolution of an important question. (*In re D.P.*, *supra*, 14 Cal.5th at p. 282.) We therefore proceed to the substance of the Water Companies' challenge to the Commission's decision.[4]

## III.

The Public Utilities Code instructs that "[i]n reviewing decisions pertaining solely to water corporations," our review is limited to determining "whether the commission has regularly pursued its authority, including a determination whether the order or decision under review violates any right of the petitioner under the Constitution of the United States or this state." (Pub. Util. Code, § 1757.1, subd. (b); see also *id.*, §§ 1757.1, subd. (c), 1760.) We conclude that the Commission failed to regularly pursue its authority when it ordered the Water Companies not to "propose continuing existing Water Revenue Adjustment Mechanisms/Modified Cost Balancing Accounts" "in their next general rate case applications" because the scoping memos do not fairly include the issue whether the Water Companies should be permitted to continue using these mechanisms.

At the outset of a quasi-legislative proceeding, the Public Utilities Code and Commission rules alike require the assigned commissioner to issue a scoping memo that identifies the issues under consideration. (See Pub. Util. Code, § 1701.1, subds. (c)

---

[4] Unfortunately, to address that substance, the Commission's merits brief purports to incorporate by reference portions of the Commission's earlier briefing, which makes the merits briefing less helpful to the court than it might have been. We caution litigants to avoid this practice in the future.

[requiring, in quasi-legislative proceedings, that "[t]he assigned commissioner shall . . . issue . . . a scoping memo that describes the issues to be considered"], (b) [same for adjudication and ratesetting proceedings]; Cal. Code Regs., tit. 20, § 7.3 ["The assigned Commissioner shall issue the scoping memo for the proceeding, which shall determine the . . . issues to be addressed"].)  Identifying the issues under consideration facilitates informed participation — including presentation of arguments and evidence — by those who may have a stake in the resolution of those issues.

If the Commission cannot fairly be said to have complied with the statutory scoping memo requirement, it has failed to regularly pursue its authority.  (See Pub. Util. Code, § 1701.1; cf. *California Trucking Assn. v. Public Utilities Com.* (1977) 19 Cal.3d 240 [annulling orders issued without statutorily required opportunity to be heard]; *Greyhound Lines, Inc. v. Public Utilities Com.* (1967) 65 Cal.2d 811 [annulling order issued without statutorily required findings].)  The Commission does not dispute the point.  Nor does the Commission dispute that, to comply with the requirement, the scoping memos should have given notice of the issues under consideration in the proceeding.

The Commission's central argument, rather, is that the initial scoping memo did, in fact, give adequate notice of the issues relevant to its order regarding the Water Revenue Adjustment Mechanisms and Modified Cost Balancing Accounts.  The Commission summed up this view in its original decision, which asserted that "[c]onsideration of changes to the WRAM/MCBA is and has always been within the scope of this proceeding as part of our review of how to improve water sales forecasting."  On rehearing, the Commission reiterated that

"[t]he issue of the decoupling WRAM was included in the original Scoping Memo as part of the water sales forecasting issue."

We are unpersuaded. The initial scoping memo described the forecasting issues as follows: "Forecasting Water Sales [¶] a. How should the Commission address forecasts of sales in a manner that avoids regressive rates that adversely impact particularly low-income or moderate income [*sic*] customers? [¶] b. In Decision (D.)16-12-026, adopted in Rulemaking 11-11-008, the Commission addressed the importance of forecasting sales and therefore revenues. The Commission, in D.16-12-026, directed Class A and B water utilities to propose improved forecast methodologies in their GRC application. However, given the significant length of time between Class A water utility GRC filings, and the potential for different forecasting methodologies proposals in individual GRCs, the Commission will examine how to improve water sales forecasting as part of this phase of the proceeding. What guidelines or mechanisms can the Commission put in place to improve or standardize water sales forecasting for Class A water utilities?" In the cited decision, the Commission had "conclude[d] that, at this time, the WRAM mechanism should be maintained." (*Decision 16-12-026*, *supra*, 2016 Cal.P.U.C. Lexis 682 at p. *63.) It was in that context that the Commission ordered water utilities to "propose improved forecast methodologies in their General Rate Case application, or in standalone, separate applications" (*id.*, at p. *130) "to lessen resort to and impact of WRAMs" (*id.*, at p. *63).

This forecasting issue does not fairly include the possibility that the Commission would order the Water

Companies not to "propose continuing existing Water Revenue Adjustment Mechanisms/Modified Cost Balancing Accounts" "in their next general rate case applications." Even if, as the Commission's original decision and decision on rehearing conveyed, the scoping memo suggested that some issues relevant to the WRAM/MCBA approach might be addressed, the scoping memos gave no signal that the forecasting issue included *elimination* of the Water Revenue Adjustment Mechanisms and Modified Cost Balancing Accounts — as opposed to, for example, "improved forecast methodologies" (*Decision 16-12-026*, *supra*, 2016 Cal.P.U.C. Lexis 682 at p. *130) that might "lessen resort to and impact of WRAMs" (*id.*, at p. *63). The connection between those approaches and questions about how to improve forecasting is simply too attenuated to have given fair notice that the potential elimination of these approaches was within the scope of the proceeding.[5]

This is not to say that a scoping memo must detail every possible outcome of a proceeding. But that is not the nature of the deficiency here. Rather, the scoping memo at issue cannot

---

[5] Likewise, the Commission's claim that "comments made by parties throughout the proceeding show the parties understood that the WRAM and sales forecasting were to be *addressed* by the Rulemaking" (italics added) does not demonstrate that the Water Companies understood elimination of these mechanisms to be within the scope of the proceeding. For example, the California Water Association's comments on the original scoping memo addressed how WRAM/MCBA recovery could be modified to reduce surcharges — reflecting an understanding that the WRAM and MCBA mechanisms would continue to be used.

fairly be said to have "describe[d] the issues to be considered" at a basic level.  (Pub. Util. Code, § 1701.1, subd. (c).)

Consideration of the history of this proceeding reinforces the conclusion.  As mentioned, the Commission had recently approved the use of Water Revenue Adjustment Mechanisms and Modified Cost Balancing Accounts, following proceedings that quite explicitly conveyed that the viability of those mechanisms was at issue.  (See pt. I.B., *ante*.)  For example, a list of questions issued in connection with a 2015 scoping memo included:

- "Should the Commission consider a tiered inclining block pricing structure that would be designed to recover the full revenue requirement of utilities within the revenue collected from the lower tiers, with the revenues from the highest tier designated for the purpose of recovering the balances in the WRAMs and the MCBAs and/or to fund conservation programs or provide rebates to customers?";

- "What rate structure and accounting mechanisms are best suited to offer safe, reliable water service at just and reasonable rates, provide incentives to conserve, and provide sufficient revenue for water system operation and investment needs?";

- "Do WRAMs and MCBAs, by decoupling the utilities' revenue functions from changes in sales, succeed in neutralizing the utilities' incentive to increase sales?  Is there a better way?";

- "Are WRAMs and MCBAs effective mechanism[s] to collect authorized revenue in light of tiered inclining block conservation rates?";

- "Do WRAMs and MCBAs appropriately incentivize consumer conservation? Are adjustments needed? Would another mechanism be better suited for the utility to collect authorized revenue for water system needs and encourage conservation . . . ?";

- "Are WRAMs and MCBAs effective at encouraging conservation when decreases in volumetric consumption by some or all consumers lead to large balances in WRAMs and MCBAs being assessed on all ratepayers? What adjustments in the WRAM or MCBA mechanisms are needed to encourage conservation?";

- "Do WRAMs and MCBAs achieve the statutory objective of safe, reliable water service at just and reasonable rates?";

- "What changes, if any, should be made to the Revised Rate Case Plan adopted by D.07-05-062 or other Commission policies adopted to reduce the balances in WRAMs and MCBAs and reduce the degree of inter-generational transfers and/or rate shock?";

- "Is there a policy or procedure that would accomplish the same results as the WRAM and MCBAs without the attendant issues discussed" elsewhere in the memo?;

- "Should the WRAM and MCBAs account for changes in sales generally, or should its effect be limited to changes in sales induced by the CPUC and other government agents?"; and

- "Should WRAM and MCBA balances continue to be collected through surcharges on quantity sales? Would other forms of surcharge be more efficient or equitable, or better accomplish safe, reliable service, at just and reasonable rates and incentivize conservation? Such other methods could include, but are not limited to, a minimum quantity charge, a minimum bill, or a fixed surcharge that does not vary with quantity consumed."

After this detailed and recent inquiry, the Commission "conclude[d] that, at this time, the WRAM mechanism should be maintained." (*Decision 16-12-026*, *supra*, 2016 Cal.P.U.C. Lexis 682 at p. *63.) With this context in mind, an informed observer would not reasonably have understood from the scoping memos in this proceeding that the Commission was contemplating the elimination of the Water Revenue Adjustment Mechanisms and Modified Cost Balancing Accounts.

The Commission also argues that "the parties had notice that changes to the WRAM/MCBA would be considered in the proceeding because, as a pilot program, the continuation of the WRAM and MCBA was regularly under consideration." That argument misses the mark. This case is about whether petitioners had notice that their WRAMs and MCBAs were under consideration in *this* proceeding, not whether they had notice that the mechanisms could or even would be under frequent reconsideration in the future. Especially when viewed

in the context just discussed, such notice was lacking here. Likewise, it appears undisputed that each WRAM had been authorized in connection with proceedings in which all relevant information was considered. The absence of a request for such information in the scoping memos is striking.

To be sure, it would not have been improper for the Commission to reassess whether policy considerations supported ending use of the WRAM/MCBA approach, much as it did in the early 2010's, after ordering some of the Water Companies, in upcoming general rate case proceedings, to address whether the WRAM should be eliminated or replaced with an M-WRAM. (*Decision 12-04-048*, *supra*, 2012 Cal.P.U.C. Lexis 191 at pp. *61–*62.) But it was improper for the Commission to do so under the auspices of the first scoping memo, which referred to improving forecasting methodologies without making any reference to potential changes to — let alone wholesale elimination of — that approach.

Finally, the Commission argues that even if the scoping memos were deficient, the Water Companies have failed to show that they were prejudiced by the deficiency. Assuming a showing of prejudice is in fact required, we disagree; the lack of notice prejudiced the Water Companies by depriving them of an adequate opportunity to present their case for preserving the use of decoupling mechanisms. It is true that once the Public Advocates Office first raised the issue of eliminating use of the WRAM/MCBA, the ALJ posed certain questions on that subject. But the ALJ's questions, posed years into this proceeding, could not and did not cure the lack of notice provided by the scoping memos. There is no argument that the ALJ could expand the scope of the proceeding, and the most relevant questions

posed — "should the Commission consider converting to [a] Monterey-style WRAM . . . ?  Should this consideration occur in the context of each utility's GRC?" — are reasonably understood to contemplate a separate, future proceeding.  Finally, the record indicates that the lack of notice hampered the Water Companies' efforts to submit and contest evidence relevant to whether the mechanisms at issue should be maintained.  The Commission was not required to agree with the Water Companies, but its failure to issue an adequate scoping memo frustrated the Water Companies' ability to advocate effectively for their position.

## IV.

We set aside the portion of the Commission's order, and the accompanying findings and conclusions, directing that the Water Companies, "in their next general rate case applications, shall not propose continuing existing Water Revenue Adjustment Mechanisms/Modified Cost Balancing Accounts." (See Pub. Util. Code, § 1758.)

**KRUGER, J.**

**We Concur:**

**GUERRERO, C. J.**
**CORRIGAN, J.**
**LIU, J.**
**GROBAN, J.**
**JENKINS, J.**
**EVANS, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion**  Golden State Water Company v. Public Utilities Commission

_____

<u>**Procedural Posture**</u> (see XX below)
**Original Appeal**
**Original Proceeding** XX
**Review Granted (published)**
**Review Granted (unpublished)**
**Rehearing Granted**

_____

**Opinion Nos.** S269099, S271493
**Date Filed:**  July 8, 2024

_____

**Court:**
**County:**
**Judge:**

_____

**Counsel:**

Sheppard, Mullin, Richter & Hampton, Joseph M. Karp, Christine A. Kolosov, Robert J. Stumpf, Jr., John D. Ellis; Nossaman, Lori Anne Dolqueist, Willis Hon, Martin A. Mattes, Alexander J. Van Roekel; California-American Water Company, Sarah E. Leeper; Prospera Law, Victor T. Fu and Joni A. Templeton for Petitioners.

BRB Law, Patrick M. Rosvall and Sarah J. Banola for National Association of Water Companies as Amicus Curiae on behalf of Petitioners.

Christine Hammond, Dale Holzschuh and Darlene M. Clark for Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Sheppard, Mullin, Richter & Hampton LLP
Joseph M. Karp
Four Embarcadero Center, 17th Floor
San Francisco, CA 94111
(415) 774-3118

Darlene M. Clark
505 Van Ness Avenue
San Francisco, CA 94102
(415) 703-1650